# Exhibit B

**AMERICAN ARBITRATION ASSOCIATION**
**DEMAND FOR ARBITRATION**

SHANE HARRINGTON AND H & S CLUB
OMAHA, INC.,

                              Claimants,

           - versus -

ANDREA GROVE,

                              Respondent.

**COMPLAINT FOR DAMAGES**
**AND EQUITABLE RELIEF**

## INTRODUCTION

Claimants submit these claims against Respondent for damages for breach of contract, perjury and attempted fraud, tortious interference with contracts, defamation, invasion of privacy, intentional infliction of emotional distress, fraudulent misrepresentation, together with requests for equitable relief and sanctions.  Respondent was a part-time exotic dancer classified as an independent contractor at Club Omaha from September 2018 to 12/21/19.  During that period, she danced approximately 3 nights per week. She was generously compensated and treated well without complaint until 12/20/19 when she staged a "tipping mutiny" in the dressing room and said to the dancers that "we shouldn't be tipping" as well as complaining that she and the other dancers should be able to smoke as often as they like.  This event led to escalating unethical, tortious, and criminal conduct by Respondent and her co-conspirators and agents directed at Claimants since 12/20/19 without cause.  Respondent contacted dozens of current and former dancers at Club Omaha to recruit them for a federal class action lawsuit while spreading defamation regarding Claimants.  Respondents have perjured themselves repeatedly in their sworn declarations filed with the federal court in Nebraska.  Complainants filed a motion to

1

dismiss Respondent's class action in federal court for lack of jurisdiction.  This AAA action is

Complainants first opportunity to file a complaint regarding Respondent's wrongful conduct.

## FIRST CAUSE OF ACTION

### BREACH OF CONTRACT

1. Respondent independent contractor Andrea Grove (Harmony) breached her two contracts

   with H & S Club Omaha, Inc. executed June 18, 2019 and a second similar contract

   around September 2018 (contracts attached hereto as Exhibit "A").

2. Pursuant to paragraph 19 of the 2019 agreement, "Performer is allowed to work at any

   other clubs not associated with CO …" Respondent claims she was an employee despite

   having had the opportunity to work where she liked whenever she liked.

3. Pursuant to paragraph 23 of the 2019 agreement, "Performer shall not be entitled to

   receive unemployment benefits, worker's compensation, disability, or any similar

   employee-related benefits from CO."  Respondent is suing for wages despite waiving her

   rights to be treated as an employee.

4. Pursuant to paragraph 31 of the 2019 agreement, "Performer shall not defame by libel or

   slander CO or their shareholders, partners, employees, agents, or contractors to anyone

   under any circumstances …"  Respondent and her co-conspirators have libeled and

   slandered Claimants repeatedly over the past six months by calling Claimant Harrington a

   rapist and a liar and making other false vile accusations.

5. Pursuant to paragraph 30 of the 2019 agreement Performer "shall maintain the

   confidentiality of the group chat (no screenshots may be shared with third parties!)"

   Respondent has taken and shared multiple screenshots of confidential group chats and

   shared them with numerous third parties, including the Nebraska Equal Opportunity

Commission (NEOC), the U.S. District Court of Nebraska, current and former Club

Omaha dancers, and lawyers and other third parties (see Exhibit "B" screenshots filed in

federal court by Respondent on 6/11/20 and 6/15/20 as examples).

6. Pursuant to paragraph 33 of the 2019 agreement "Performer shall maintain the

confidentiality of all activities and members at CO …"  Respondent has repeatedly

violated this provision over the past six months with her NEOC complaint, class action,

and numerous other acts, including text messages, emails, and phone calls.

7. Pursuant to paragraph 36 of the 2019 agreement "CO or Performer may terminate this

agreement at any time with or without notice."  Despite having the opportunity to quit at

time with or without notice, Respondent made no complaints during 15 months of

dancing at Club Omaha and only invented grievances for retaliation.

8. The third page of both agreements contains a dispute resolution and arbitration clause

which provides as follows: "Performer is bound by CO's arbitration clause as

follows:  Any dispute between Performer and CO must be presented in writing followed

by a 30-day period during which the parties must enter good faith negotiations.  If no

resolution is reached all disputes may only be resolved by way of binding arbitration with

the American Arbitration Association's regional office in Denver, Colorado pursuant to

the laws of the State of Nebraska.  Performer my not sue in an individual, group or class

action, CO, it's shareholders, partners, employees, agents, contractors, or any affiliated

therewith."

9. Respondent, her co-conspirators, and her attorneys violated this dispute resolution

provision by filing an NEOC complaint and class action complaint in federal court

against Complainants without giving Complainants the opportunity to resolve the dispute and without voluntarily submitting to AAA arbitration.

10. Respondent repeatedly violated numerous provisions of her contract which was terminated on that basis, including but not limited to insubordination, privacy violations, defamation, and posting, publishing and circulating confidential screen shots of Club Omaha messages together with other violations of her contract that have occurred since December 20, 2019.

11. Respondent has violated the covenant of good faith and fair dealing in contracts.

12. As a result of Respondent's breaches of contract, Complainants have suffered monetary damages, plus over $30,000 in legal fees, the $2,200 AAA filing fee for this proceeding, and damages to Complainants' reputation and business revenue in an amount to be determined by an arbitrator in excess of $500,000.

## SECOND CAUSE OF ACTION

## PERJURY & ATTEMPTED FRAUD, EXTORTION & BLACKMAIL

13. Respondent filed a frivolous and bad faith class action in the United States District Court of Nebraska on or about May 26, 2020 (Exhibit "C") based upon a perjured declaration under oath, including several disprovable lies by Respondent for the purpose of fraudulently obtaining money for minimum wages, overtime and other damages.

14. Respondent falsely stated in her perjured declaration dated May 26, 2020 (Exhibit "D") that she had a work schedule as an exotic dancer which is a lie that can be disproven with affidavits, records, and witness testimony.

4

15. Respondent falsely stated in this declaration that she worked 4 – 5 days per week at Club Omaha 10 – 12 hours per day, when Claimants' records and witnesses prove she actually worked an average of 3 days per week at an average of 9 hours or less per day.

16. Respondent falsely stated in this declaration that she was never paid by Club Omaha, yet Club Omaha has two cancelled checks for $400 each payable to Respondent Andrea Grove (attached as Exhibit "E").

17. Respondent's class action lawsuit contains several false statements of fact manufactured by Defendant and her lawyers to fraudulent create a labor law case for damages.

18. The FLSA Consent to Join Collective Action form filed with the Nebraska federal court by Respondent (Exhibit "F") is not signed and falsely states Respondent worked until February 2020 when her last night was Friday, December 20, 2019 (into the morning of Saturday, December 21st).

19. The lawsuit falsely states in paragraph 11 that, "There were between 25 – 30 exotic dancers working at Club Omaha on any given night." The most dancers in a single night in over 1,000 nights of operation was 23, second most was 21, with an average of 7 – 12 on weeknights and 14 – 18 on weekend nights.

20. The lawsuit falsely states in paragraph 12 that, "Plaintiff and other exotic dancers were required to schedule their shifts in advance" when Club Omaha never scheduled shifts for dancers.

21. The lawsuit falsely states in paragraph 13 that, "Plaintiff and other exotic dancers were required to pay $20 - $50 in house fees each night."  Defendant received free house on dozens of occasions and many other dancers did as well, so these fees were not paid "each night."

22. The lawsuit falsely states in paragraph 14 that, "Plaintiff and other exotic dancers were required to arrive at the club dressed and ready to perform." This is false as both of Club Omaha's locations since 2017 have had large dressing rooms for the dancers and ladies' restrooms that are used almost exclusively by the dancers. Dancers never arrive dressed and ready to perform as they all go to the dressing and restrooms to put on their makeup, style their hair, and put on their outfits. Club Omaha opens to dancers 30 minutes before the club opens to members to allow dancers the opportunity to prepare for their shift in the club.

23. The lawsuit falsely states in paragraph 16 that, "Plaintiff and other exotic dancers did not receive any wages from Club Omaha" yet Defendant Andrea Grove did receive wages in the form of checks from Club Omaha and many other dancers did as well.

24. The lawsuit falsely states in paragraph 16 that, "Club Omaha set the prices customers were required to pay for dances" when Club Omaha only has suggested prices, allowing dancers to charge more or less at their own discretion.

25. The lawsuit falsely states in paragraph 18 that, "Plaintiff and other exotic dancers were require to go up on stage at regular intervals during their shift" when dancers were always allowed to shuffle the dancer schedule as needed.

26. The lawsuit falsely states in paragraph 18 that, "If a dancer did not go up on stage during a given shift, she had to pay a $100 fee to Club Omaha." This was not in the contract and no one was ever fined for missing a stage set. What the contract says is that a dancer can buy themselves off stage for a "night" for $100. That provision was added because Club Omaha had a dancer who was partially disabled and was unable to perform on stage but was able to perform private dances, so she was permitted to work at the club without

6

dancing on stage subject to a $100 fee.  Since Club Omaha made this exception for this dancer they added it to the contract to be fair to everyone.

27. The lawsuit falsely states in paragraph 21 that, "Plaintiff and other exotic dancers were required to "tip out" each night, paying a minimum of $5 each to the DJ, security, and the manager."  In June 2019 a voluntary, optional tipping policy was introduced into the Club Omaha dancer contracts that was not mandatory.  Some dancers tipped more than others and some not at all but tipping was never required and no one was ever reprimanded for failing to tip.

28. The lawsuit falsely states in paragraph 23 that, "Plaintiff was terminated from Club Omaha after standing up for another dancer who refused to tip out Club Omaha's staff.  This dancer was also terminated."  The dancer Veronica that Defendant was "standing up for" actually tipped on the night that Defendant staged her tipping mutiny and Veronica was not terminated or reprimanded for failing to tip.  Defendant was not reprimanded for "standing up for another dancer."

29. Respondent's sworn declaration from On May 26, 2020 was filed with the federal court in Nebraska containing many of the same lies included in the lawsuit (see paragraphs 6, 7, 8, 12, 13, 14, 19, and 21 in Exhibit "D").

30. While Respondent argued in her lawsuit that Club Omaha made a schedule in advance (to try to show that Club Omaha is an employer), in Respondent's May 26, 2020 declaration she states, "dancers, including myself, would rush to the club to run to the front of the club to 'clock in' just to be told that the club had reached its nightly cap and we have to go home."  Respondent admitted there was no schedule and that anyone could show up and "clock in."

7

31. On June 14, 2020 Respondent filed a second sworn declaration with the federal court including additional lies (Exhibit "G").

32. This second affidavit falsely states in paragraph 3, "I was terminated from club Omaha after I stood up for another dancer who refused to tip out the club staff. This dancer was also terminated on the same day." The dancer Respondent is referring to Veronica did in fact tip on December 20, 2019, the night in question, and neither dancer was reprimanded, suspended, or terminated for not tipping on that night or any other night.

33. This second affidavit falsely states in paragraph 6 that, "At least two dancers told me they were fired last week after Shane learned they were part of this case." The two dancers Respondent is referring to, Cassandra Schueth (Dallas) and Diana Blanco (Mileena) were not "fired" by Complainant. Dallas has not danced at the club since March 2020 (ten weeks before the class action lawsuit was filed) and informed the club that she was quitting and had no plans to return because she wanted to "move on with (her) life." Mileena was not fired but since Claimant learned she was suing over the terms of her independent contract agreement she was offered a position as an employee with a new contract, an offer which she has declined.

34. On June 14, 2020, Respondent's attorney Olena Savytska filed a declaration under oath with the federal court in Nebraska (Exhibit "H") that falsely stated in part, "On June 11, 2020, I spoke with opt-in Diana Blanco. Ms. Blanco informed me she was confronted by Mr. Harrington, in the presence of Mr. Spencer, at Club Omaha …" Mr. Spencer was not present in this meeting as proven by video surveillance.

35. Respondent is fraudulently attempting to obtain minimum wage and overtime wages from Claimants when she typically earned 5x – 10 x minimum wage and never worked more than 40 hours in any given week.

36. Respondent encouraged other Club Omaha dancers Dallas, Jinx, and Veronica to submit perjured affidavits with the Nebraska federal court to help her frivolous litigation and has solicited other current and former Club Omaha dancers to join this case with lies, false promises, and incorrect legal advice given by a non-attorney.

37. As a result of the foregoing, Claimants have sustained monetary damages in excess of $500,000 together with attorneys' fees and the costs of this action.

### THIRD CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION

33. Respondent has engaged in fraudulent misrepresentation by contacting dozens of current and former Club Omaha dancers and providing them false legal advice regarding Claimant's activities, by promising current and former dancers money if they join the class action, by falsely claiming that Claimants' Independent Contractor Contracts exploit dancers, by calling Claimant Harrington horrible things, by filing a NEOC complaint when Respondent had no standing, and by filing a class action with numerous false statements of fact.

34. Respondent engaged in fraudulent misrepresentation by contacting their lawyers in Boston and lying to them about numerous things so they would represent Respondent and her co-conspirators.

35. As a result of the following, Complainant has sustained damages in the amount of $500,000 plus attorneys' fees and the costs of this proceeding.

9

## FOURTH CAUSE OF ACTION

### DEFAMATION

36. Respondent, her agents and co-conspirators have defamed Claimants on Facebook by falsely accusing Claimant Harrington of being a rapist and other vile accusations.

37. Respondent defamed Plaintiff Shane Harrington by libel and slander falsely telling numerous people and entities that Claimant Harrington "fired" Respondent because she stood up for a dancer who did not want to tip $5 one night to the Host which is a false statement of fact.

38. Respondent defamed Claimant Harrington by falsely telling numerous people and entities that Harrington requires dancers to tip at Club Omaha when this is a false statement of fact.

39. Respondent has defamed Claimant Harrington by telling dancers he is breaking the law.

40. As a result of the following, Complainant has sustained damages in the amount of $500,000 plus attorneys' fees and the costs of this proceeding.

## FIFTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

40. Respondent falsely accused Plaintiff Harrington of being a rapist on the internet including social media.

41. Respondent filed a false claim for sexual harassment against Club Omaha in February 2020.  It was not her claim that she was harassed, but rather she heard rumors about someone else being harassed.  As such, Respondent had no standing to file this claim and it was merely done for the purpose of causing Claimant emotional and mental distress.

10

42. Respondent filed and served Claimant with a frivolous federal class action on May 26, 2020, for the purpose of causing extreme emotional distress.

43. Respondent solicited Club Omaha dancers who were on their roster to disrupt and damage Claimants business and reputation.

44. As a result of the following, Claimant has suffered severe emotional, mental and physical distress, causing damages in an amount to be determined by an arbitrator.

## SIXTH CAUSE OF ACTION

## TORTIOUS INTERFERENCE

45. Respondent tortiously interfered with Club Omaha's contracts with at least ten current and former dancers.

46. Respondent is aware that every current and former Club Omaha dancer has a contract with Club Omaha the includes a confidentiality clause, class action waiver, and arbitration clause.

47. Respondent told current and former dancers at Club Omaha lies with the intention of causing them to stop dancing at Club Omaha.

48. Respondent encouraged dancers to sue Claimants, including but not limited to Diana Blanco and Cassandra Schueth without following the 30-day dispute resolution process, arbitration clause, class action waiver, and confidentiality agreement.

49. Respondent, though not an attorney, gave and continues to give legal advice to Club Omaha dancers for the purpose of soliciting them as Plaintiffs for her frivolous federal class action.

50. As a result, Claimants have suffered $500,000 in monetary damages due to Respondent's tortious interference together with attorneys' fees and the costs of this action.

## SEVENTH CAUSE OF ACTION

### INVASION OF PRIVACY

51. Respondent has engaged in invasion of Claimants privacy by taking screen shots of confidential Club Omaha communications and distributing them to the public, including but not limited to those in Exhibit "B".

52. Respondents have had and continue to have one or more spies in Club Omaha that feed Respondent screen shots and other confidential information for distribution to the public.

53. These private messages distributed to the public by Respondent and her co-conspirators include confidential corporate matters, confidential memorandum, confidential notices, and confidential emails, including trade secrets and confidential communications.

54. As a result of Respondent's invasion of privacy, Claimants have suffered $500,000 in monetary damages together with attorneys' fees and the costs of this action.

## EIGHTH CAUSE OF ACTION

### CONSPIRACY

55. Respondent, individually and jointly, in conjunction with at least ten former Club Omaha dancers, including but not limited to Chrystina Winchell (Veronica), Cassandra Schueth (Dallas), Diana Blanco (Mileena), Katlynn Clark (Alexis), Destinee Magnuson (Jinx), Jade Guerrero (Mina), Autumn Smith (Nikki), Sarah Frank (Zoe), Allyia Lewis (Leelah) and Rylee Struble (Rylyee) are engaged in a conspiracy to commit breach of contract, defamation, perjury, fraud, extortion, blackmail and other torts and crimes against Claimants to obtain money and cause damage to Claimant Harrington's professional and personal reputation..

12

56. As such, all of these individuals are jointly and severally liable for the damages sustained by Respondent.

57. Wherefore, Respondent requests an order declaring all co-conspirators responsible for Respondent's damages in the amount of $500,000 plus attorneys' fees and the costs of this proceeding.

### NINTH CAUSE OF ACTION

### NEGLIGENCE

58. Respondent owed and continues to owe Claimants a duty of reasonable care pursuant to the terms of her contract with Club Omaha.

59. Respondent was negligent, careless, and reckless in the dressing room of Club Omaha on the night of Friday, December 20, 2019, when she said negative things about the club, the owner, and the manager to approximately a dozen dancers.

60. Respondent's speech created doubt, confusion, stress, and anxiety for the Club Omaha dancers during a busy Friday night.

61. Respondent was negligent, careless, and reckless in failing to address her concerns with the Claimants privately and discretely.

62. Respondent's anger over a suggested $5 tipping policy did not constitute an emergency that needed to be addressed while the club was open on a weekend night.

63. Respondent was negligent, careless, and reckless in failing to provide her Boston employment attorneys with copies of her Club Omaha contracts including arbitration clauses and class action waivers, when Respondent had been provided copies of the contract on multiple occasions including December 20, 2019.

64. Respondent was negligent, careless, and reckless in filing a false complaint with the NEOC that violated the confidentiality clause of her contract.

65. Respondent was negligent, careless, and reckless in filing a "Consent to Join Collective Action" form that was not signed by Respondent and contained false information regarding the dates Respondent worked at Club Omaha.

66. Respondent was negligent, careless, and reckless in executed a declaration on May 26, 2020 for filing in federal court that contained numerous misstatements of fact.

67. Respondent was negligent, careless, and reckless in pursuing her class action after her attorneys were provided with copies of her Club Omaha contracts on May 30, 2020.

68. Respondent was negligent, careless, and reckless in spreading rumors and lies about Complainant Harrington at Club Omaha, on social media, and in public.

69. Respondent was negligent, careless, and reckless in giving current and former Club Omaha dancers legal advice about employment status and labor rights in Nebraska.

70. Respondent was negligent careless, and reckless in failing to provide Claimants with any written or oral notice of any complaints or issues that Respondent had between September 2018 and December 2019, the period when Respondent danced at Club Omaha.

71. As a result of the foregoing, Claimants have sustained damages in the amount of $500,000 plus attorneys' fees and the costs of this arbitration proceeding.

## **TENTH CAUSE OF ACTION**

### **RESTRAINING ORDER & PERMANENT INJUNCTION**

71. Claimants request an order from the arbitrator precluding Respondent, her attorneys, co-conspirators and agents from contacting current and prior Club Omaha dancers.

72. Respondent is not a lawyer and her attorneys are not admitted to practice law in Nebraska where the majority of Claimants' current and former dancers reside.

73. For the past six months Respondent, her attorneys, and their agents and employees have been contacting current and former Club Omaha dancers for the unethical purpose of soliciting them for labor law litigation when none of these laborers suffered any damages.

74. Respondent, her attorneys, and their agents and employees have told and continue to tell Club Omaha dancers lies about their legal rights so the Boston law firm can recover legal fees and Respondent can recover money and together with revenge and retaliation.

75. Club Omaha current and former dancers have complained that Respondent and her lawyers have repeatedly called and messaged them for purposes of solicitation as clients.

76. As a result, Claimants have suffered monetary damages together with attorneys' fees and the costs of this action.

77. Wherefore, Claimants request an order from this tribunal prohibiting Respondent, her agents, and attorneys from contacting Club Omaha current and former dancers.

## ELEVENTH CAUSE OF ACTION

## WAIVER OF RIGHT TO AAA ARBITRATION

78. Respondent has waived her right to a AAA arbitration by violating her contract and suing Claimant in federal court.

79. "(W)e routinely apply a tripartite test to determine whether a party has waived its right to arbitration. We find waiver when the party "(1) knew of its existing right to arbitration; (2) acted inconsistently with that right; and (3) prejudiced the other party by its inconsistent actions." *Dumont*, 258 F.3d at 886 (citing *Ritzel*, 989 F.2d at 969). *Hooper v. Cash Advance Centers*, 589 F.3d 917, 920 (8th Cir. 2009)

80. Respondent and her co-conspirators have waived their right to arbitration by filing a class action in federal court when they knew they were bound by a class action waiver and arbitration clause.

81. Complainant has been prejudiced by Respondents actions by unethical soliciting of Complainants' dancers as plaintiffs and witnesses in a lawsuit, witness tampering, the causes of action listed in this AAA demand for arbitration complaint, and legal costs for defending frivolous litigation in an amount exceeding $30,000.

**TWELFTH CAUSE OF ACTION**

**EQUITABLE ESTOPPEL**

82. Respondent danced at Club Omaha for 15 months without complaint, earning over $25,000 (well above minimum wage), working an average of only 3 days per week at an average of 25 hours per week.

83. Respondent worked only on the nights she wanted to and came and left the club when she wanted to.

84. Respondent was permitted to dance at other clubs and engage in other gigs and occupations, including her Respondent's cleaning company and events services.

85. Respondent was never injured, disrespected, exploited, or otherwise damaged by Plaintiffs.

86. Claimants tolerated disturbances by Respondent's boyfriend who texted and called Claimants and Club Omaha manager on two separate occasions looking for Respondent who had disappeared.

87. Respondent has no equitable grounds for damages as she was generously compensated and never worked overtime.

88. Furthermore, since Respondent breached her contracts, acted in bad faith, refused to engage in the 30-day Club Omaha dispute resolution process, and filed a frivolous class action in federal court against Club Omaha, all resulting in over $30,000 in legal fees to Claimants, she is precluded from recovering any damages from Club Omaha in a AAA arbitration proceeding for minimum wage, overtime or other damages due to breach of contract, unclean hand, and equitable estoppel.

## THIRTEENTH CAUSE OF ACTION

### UNCLEAN HANDS DOCTRINE

89. Respondent is precluded in recovering damages for wages pursuant to the unclean hands doctrine, which holds that one shall not come into a tribunal to request relief if they themselves have unclean hands regarding the same matter.

90. In the present case, Respondent has intentionally and repeatedly violated her contract by refusing to enter the 30-day dispute resolution period, by failing to abide by the confidentiality agreement, by filing a frivolous claim with the NEOC, and by filing a class action in federal court when her contracts have arbitration clauses and class action waivers.

91. Since Respondent has engaged in a plot to destroy Claimants over the last six months, including unethical, tortious, and criminal conduct including perjury, attempted extortion and blackmail, all in violation of her contract, Respondent should be precluded from recovering anything as she has unclean hands.

17

## FOURTEENTH CAUSE OF ACTION

### SANCTIONS

92. Since Respondent and her attorneys were aware of the arbitration clause and class action waiver in Respondent's contract, Respondent and her attorneys should be sanctioned for filing a frivolous class action lawsuit in a federal court that had no jurisdiction.

93. Respondent and her attorneys filed the frivolous case for the bad faith purpose of soliciting clients.

94. Respondents also filed a motion for conditional class certification with perjured affidavits and filed an emergency motion with an additional perjured affidavit.

95. As such, Respondent and her attorneys should be sanctioned for filing costly frivolous litigation in bad faith.

96. In addition, Respondent filed a fraudulent complaint with the NEOC falsely claiming she was the victim of sexual discrimination at Club Omaha.

97. However, it is not her claim that she was discriminated against, but rather that another woman at the club was harassed, so Respondent had no standing to assert this claim, it was purely a retaliatory act on her part.

98. Respondent's complaint with the NEOC violates her contracts, including the 30-day dispute resolution clause and confidentiality clause as does her class action lawsuit.

99. Claimants request a hearing to determine legal fees incurred in the defense and opposition to the frivolous and bad faith class action lawsuit and NEOC complaint by Respondent.

WHEREFORE, Plaintiffs H & S Club Omaha, Inc. and Shane Harrington hereby pray for relief in the amount of $500,000 in damages from Respondent and her co-conspirators and attorneys, plus legal fees and the costs of this action, together with equitable relief requiring Respondent and her co-conspirators to delete all posts online regarding Claimants and enjoining Respondent, her agents, and attorneys from contacting Club Omaha current or former dancers.

## CHOICE OF LAW

99. The contracts state they shall be governed by the laws of the State of Nebraska.

100.     Therefore, the FLSA does not apply.  Even if an FLSA claim was permitted under the parties' contracts an identical claim by a stripper in Nebraska (case attached hereto as Exhibit "I") under the FLSA was denied by the Nebraska Supreme Court in 2018 because strippers are not engaged in interstate commerce.

101.     Plaintiffs proceeds under statutory law and the common law of the State of Nebraska against Respondent for damages and equitable relief.

## DISCOVERY DEMANDS

102.     Claimants have requested and will demand the following for discovery and inspection from Respondent as part of this arbitration proceeding:

a.  Copies of all alleged work schedules of Respondent.

b.  Dates and hours allegedly worked by Respondent.

c.  Amount allegedly earned per shift by Respondent.

d.  Weeks allegedly worked more than 40 hours by Respondent.

e.  Dates where Respondent allegedly did not earn minimum wage of $9.00 per hour.

f.  Dates, times, amounts, and recipients of alleged mandatory tipping by Respondent.

g.  Copies of Respondent's tax returns for years worked at Club Omaha.

h.  Copies of Respondent's bank statements during months worked at Club Omaha.

i.  Copies of all written complaints by Respondent to owner or manager by text, email, note, or otherwise.

j.  Copies of any other documents, photos, or other relevant evidence in Respondent's possession.

k.  Expert witness access to Respondent's email, texts, and social media accounts to copy all messages, publications, and posts regarding Claimants since September 2018 (for in camera review if necessary).

l.  Litigation history of Respondent.

m.  Criminal history of Respondent.

n.  Total amount claimed for damages.

o.  Deposition of Respondent under oath after obtaining aforementioned discovery.

## **CONCLUSION**

Club Omaha exotic dancers, like most strippers in the United States, do not want to be employees.  They make far more money and have far more freedom as independent contractors.  The class action lawsuit filed under the FLSA is a frivolous, bad faith attempt to extort money from Claimants for dancers who were never damaged or mistreated by Club Omaha.  After she was terminated, Respondent filed a claim with NEOC claiming she was the victim of sexual discrimination (when it was actually another dancer who claimed she was harassed not Respondent herself).  Then, six months later she files a class action in federal court claiming she did not receive minimum wage and overtime and that she was forced to tip.  Respondent Andrea Grove is a mentally unstable person seeking revenge against Claimants for personal reasons that have nothing to do with employment law or any other viable legal

20

claim.  Ms. Grove disappears from her boyfriend for days at a time and stays awake for days on

pills and takes the drug molly at raves.  Andrea also has a criminal record.  She is not a credible

witness and Claimants already have over a dozen affidavits from witnesses that prove

Respondent and her co-conspirators are perjuring themselves with their false declarations under

oath.  This tribunal should hold Respondent, her co-conspirators, and their attorneys liable for

their unethical, tortious, and criminal conduct and award Claimants their attorneys' fees plus

damages.

**AMERICAN ARBITRATION ASSOCIATION**
**DEMAND FOR ARBITRATION**

SHANE HARRINGTON AND H & S CLUB
OMAHA, INC.,

                                    Claimants,

        - versus -                                    **INDEX OF EXHIBITS**

ANDREA GROVE,

                                    Respondent.

1. <u>Exhibit A</u>: Two contracts between the parties designating AAA as the dispute resolution forum by way of arbitration at the regional office in Denver, Colorado pursuant to the laws of the State of Nebraska.

2. <u>Exhibit B</u>: Screenshots taken or otherwise obtained by Respondent and published in violation of her contract.

3. <u>Exhibit C</u>: Summons and frivolous Class Action Complaint filed in the United States District Court of Nebraska on 5/26/20, by Respondent against Claimants.

4. <u>Exhibit D</u>: Perjured declaration by Respondent executed on or about 5/26/20.

5. <u>Exhibit E</u>: Two $400 checks payable from Claimant H & S Club Omaha, Inc. to Respondent.

6. <u>Exhibit F</u>: Respondent unsigned FLSA form executed 5/14/20 and filed 5/26/20.

7. <u>Exhibit G</u>: Second perjured declaration by Respondent dated 6/14/20.

8. <u>Exhibit H</u>: Affidavit of Respondent's attorney Olena Savytsa dated 6/14/20.

9. <u>Exhibit I</u>: Copy of Mays v. Midnite Dreams, Inc., 300 Neb. 485 (Neb. 2018) (Shaker's case decided by the Nebraska Supreme Court two years ago regarding a strip club 40 miles from Club Omaha)

# EXHIBIT

## "A"

*Harmony*

## CLUB OMAHA
### Independent Contract Dancer Agreement

H & S Club Omaha, Inc. d/b/a Club Omaha ("CO") and the independent contractor/exotic dancer named below (herein referred to as "Performer") who wishes to join CO as a member and dance in consideration for tips and performance fees, hereby enter into the following agreement:

Performer agrees to abide by CO's rules and regulations while performing at CO and private events, including but not limited to the CO articles of incorporation, bylaws, rules and regulations posted at the CO front entrance, front desk, and the following Performer rules:

1. CO operating hours are 6:00 pm to 5:00 am seven days a week but if CO is slow during the week CO will close earlier but in no event earlier than 3:00 am. CO may stay open later than 5:00 am for private parties or private dances at the discretion of management.
2. CO may close on certain holidays including Easter, Independence Day, Thanksgiving, and Christmas or limit operating hours (ie. 10:00 pm – 4:00 am).
3. CO is a private membership club that charges $25 - $35 for a one-night membership, $50 - $60 for a one-year membership, and $300 for a VIP Gold membership. CO may modify membership charges and may offer specials on the CO FB page and with $20 gift cards.
4. CO member admission price is $10 Sunday to Thursday and Friday & Saturday before midnight. Member admission price is $20 after midnight on Friday & Saturday. Admission prices are in addition to one night or annual membership fees.
5. Performer shall park in the back of CO on Friday and Saturday nights and in front of CO on Sunday to Thursday nights. Performer must enter CO through the back from 5:30 – 6:30 pm on weekend nights and must enter the front after 6:30 pm. Performer must be walked to their cars at night by security or a manager.
6. Performer shall pay a house fee ("House") per shift for rental of a private locker and access to the dressing room, stage and private rooms for professional purposes.
7. House is $20 on weeknights (Sunday – Thursday) and $50 on weekends (Friday & Saturday) if Performer signs in by 6:30 pm. House is an additional $10 if Performer signs in from 6:31 to 7:00 and $10 additional every half hour thereafter. Performer must be dressed and ready to perform when signing in.
8. Performer must work a minimum of two weekday shifts from Sunday to Thursday.
9. If Performer works only one weekday in a given week she must pay a $100 weekend penalty for the first weekend night she dances that week (plus House).
10. If Performer fails to dance at all during a given week she must pay a $100 penalty for each weekend night she dances that week (plus House).
11. Performers are capped at 14 Sunday to Thursday with exceptions made for new Performers and Traveling Performers. Performers are capped at 18 Friday & Saturday with exceptions for Traveling Performers. The cap may be lifted for special events such as College World Series and Berkshire Hathaway Convention.
12. Performers who dance at least three weekdays for a full 8-hour shift earn free weekend House for Friday and/or Saturday night. Performers must reserve weekend spots Thursday evening and sign in by 9:00 pm Friday and/or Saturday to work.

1

13. Dance prices are $30 for a single song ($20 for Performer), $100 for a 15-minute bed dance ($70 for Performer), $200 for a 30-minute bed dance ($140 for Performer) and other prices for Toy Shows and other performances.
14. Management may run dance specials from time to time as needed.
15. There will be a $20 penalty if Performer gets less than two private dances in a shift.
16. Performers may buy themselves off stage for $100 per shift. When a Performer buys themselves off stage they have the option of dancing one or more sets without penalty.
17. A shift is at least eight hours between 6:00 pm and 5:00 am or as set up by the manager.
18. Dancers may pay a $50 penalty plus House to leave before they have reached 8 hours.
19. Performer is allowed to work at any other clubs not associated with CO as long as Performer meets the requirements set forth in this agreement.
20. Performer consents to allow CO to use Performer's photos, videos, snapchat and dancer name to promote CO on social media.
21. Performer agrees that if CO is promoting Performer on any social media Performer is required to be there every night that is included in the promotion.
22. Performer is required to be clean and well-groomed every shift they are providing their services; including but not limited to, natural hair colors (example Blonde, Black, Brunette, and Red if natural looking). This business is based around looks and your overall appearance controls the amount of money you make.
23. Performer agrees they are an Independent Contractor and waives any right to receive an hourly wage based on their status. Performer shall not be entitled to receive unemployment benefits, worker's compensation, disability, or any similar employee-related benefits from CO.
24. Performer recognizes there are inherent risks to performing at CO and waives any right to sue CO for personal injuries sustained on CO property or other locations (whether while dancing, slip and fall, etc.), as well as sexual harassment, defamation, or any other civil causes of action.
25. Performers are responsible for paying taxes as required by law.
26. Performer shall not engage in any illegal activities at CO including but not limited to drug use/sale or prostitution and shall report any illegal activities they observe to CO.
27. Performer shall not arrive intoxicated on drugs or alcohol for a shift and shall not consume alcohol during a shift without permission of management.
28. Performer shall not accept an alcoholic drink from a member and may not sell or give alcohol to anyone in or outside CO.
29. CO suggests that Performers follow an optional tipping structure to reward the team that makes it possible for you to make money each night. Performers should consider tipping $15 minimum for a slow night and up to $100 for a great night ($5 min for DJ, $5 min to cover all Security as a team, $5 min for Manager). *Some of the things the DJ does to help you make more money are: playing your song requests, hyping you up to the crowd, and juggling the dance order so you can skip stage to do private dances. Some of the things security does to help you make more money and keep you safe are: walking you to your car, carrying your bag, helping members find you, and recommending you to members for private dances. Some things the manager does to help you make money are: running*



*dance specials to get you more dances, upselling dances for you, helping members find you, and recommending you to members.*

30. Performer shall follow the CO Facebook group chat by reading all messages in their entirety a minimum of once per day and shall maintain the confidentiality of the group chat (no screenshots may be shared with third parties!). _AG_ (Initial)

31. Performer shall not defame by libel or slander CO or their shareholders, partners, employees, agents, or contractors to anyone under any circumstances, including but not limited to negative commentary, threats, etc. on social media. Performers who do so shall be liable for monetary damages caused by such defamation. _AG_ (Initial)

32. Performer shall not give personal contact information to any CO member and shall not meet or socialize with any CO member outside the clubs without permission of CO.

33. Performer shall maintain the confidentiality of all activities and members at CO and shall not take pictures or videos at Club Omaha without express permission from management.

34. CO may modify this agreement with written notice to Performer.

35. CO may suspend Performer for violating any of these rules or regulations.

36. CO or Performer may terminate this agreement at any time with or without notice.

Performer is bound by CO's arbitration clause as follows:  Any dispute between Performer and CO must be presented in writing followed by a 30-day period during which the parties must enter good faith negotiations.  If no resolution is reached all disputes may only be resolved by way of binding arbitration with the American Arbitration Association's regional office in Denver, Colorado pursuant to the laws of the State of Nebraska.  Performer may not sue in an individual, group or class action, CO, it's shareholders, partners, employees, agents, contractors, or any affiliated therewith.

Agreed and accepted this _18_ day of ___June___, by and between:

_Andrea Grove_
Performer's Real Name Printed

_Andrea Grove_
Performer's Signature

_Harmony_
Dancer Name

_(402)504-2972_
Performer's Phone Number

_Slinkyharmony@Gmail_
Performer's Email

_Shane Harrington_
CO Representative's Name Printed

_____
CO Representative's Signature

3

*Harmony*

# CLUB OMAHA

## Independent Contract Dancer Agreement

H & S Club Omaha, Inc. d/b/a Club Omaha ("CO") and the independent contractor/exotic dancer named below (herein referred to as "Performer") who wishes to join CO as a member and dance in consideration for tips and performance fees, hereby enter into the following agreement:

Performer agrees to abide by CO's rules and regulations while performing at company locations in Omaha and other locations (including but not limited to private parties), including but not limited to the CO articles of incorporation, bylaws, rules and regulations including those posted at the CO exterior front entrance and the following:

1. CO operating hours are 6:00 pm to 5:00 am seven days a week but if we are slow during the week we will close earlier but no event earlier than 3:00 am. CO may stay open later than 5:00 am for private parties or private dances at the discretion of management.
2. CO may close on certain holidays including but not limited to Easter, Independence Day, Thanksgiving, and Christmas.
3. CO is a private membership club that charges members $30 for a one-night membership, $50 for a one-year membership, and $300 for a VIP Gold membership. CO may modify membership charges with written notice and may offer specials on the CO Facebook page.
4. CO member admission price is $10 Sunday to Thursday and Friday & Saturday before midnight. Admission price is $20 after midnight on Friday & Saturday. Admission prices are in addition to one night or annual membership fees.
5. Performer shall pay a house fee for the stage as well as the private rooms. These fees are per shift.
6. House fees for Performers are $20 if you sign in before 6:30 pm. House fees from 6:31 to 7:00 are an additional $10 and $10 additional every half hour thereafter that you sign in. Performers must be dressed and ready to perform when they sign in.
7. Total Performers are capped at 14 from Sunday to Thursday. Total Performers are capped at 18 from Friday & Saturday. (Excluding special events such as College World Series, Berkshire etc)
8. Dance prices are $30 for a single song ($20 for Performer), $100 for a 15-minute bed dance ($70 for Performer), and $200 for a 30-minute bed dance ($140 for Performer).
9. Performers may charge more with permission of manager and management may offer dancer specials to members with notice to Performers including but not limited to two for one single song dances and $99 20-minute bed dances.
10. There will be an additional $20 house fee if Performer gets less than two private dances in any given shift.
11. Performers may buy themselves off stage for $40 per shift. When a Performer buys themselves off stage they have the option of dancing one or more sets if they choose to

1

without penalty. Dancers may also pay $50 in order to leave before they have reached 8 hours.

12. Performers must pay a $30 private dance security fee and DJ play list fee to Security and DJ Friday & Saturday nights.  Sunday to Thursday nights tipping DJ and Security for dance security and playlists is optional.

13. Performer is required to work a minimum of two weekday shifts from Sunday to Thursday.

14. If Performer fails to dance two weekdays in a given week, they must pay a $100 weekend penalty for each weekend night (Friday or Saturday) they dance that week.  If Performer dances only one weekday in a given week, they must pay a $100 weekend penalty for the first weekend night they dance that week.

15. A shift is at least eight hours between 6:00 pm and 5:00 am or as set up by the manager.

16. Performer is allowed to work at any other clubs not associated with CO as long as Performer meets the requirements set forth in this agreement.

17. Performer consents to allow CO to use Performer's photos, videos, snapchat and dancer name to promote CO on social media.

18. Performer shall not take photos or videos on CO property without the permission of the manager on duty and shall not post or share any such photos or videos without written permission of CO.

19. Performer agrees that if CO is promoting Performer on any social media Performer is required to be there every night that is included in the promotion.

20. Performer is required to be clean and well-groomed every shift they are providing their services; including but not limited to, natural hair colors (example Blonde, Black, Brunette, and Red if natural looking).  This business is based around looks and your overall appearance controls the amount of money you make.

21. Performer agrees they are an Independent Contractor and waives any right to receive an hourly wage based on their status.

22. Performer recognizes there are inherent risks to performing at CO and waives any right to sue CO for personal injuries sustained on CO property or other locations (whether while dancing, slip and fall, etc.), as well as sexual harassment, defamation, or any other civil causes of action.

23. Performer shall not be entitled to receive unemployment benefits, worker's compensation, disability, or any similar employee-related benefits from CO.

24. Performers are responsible for paying taxes as required by law.

25. Performer shall not engage in any illegal activities at CO including but not limited to drug use/sale or prostitution and shall report any illegal activities they observe at CO to the manager on duty.

26. Performer shall not arrive intoxicated on drugs or alcohol for a shift and shall not consume alcohol during a shift without permission of management.

27. Performer shall not accept an alcoholic drink from a member and may not sell or give alcohol to anyone in or outside CO.
28. Performer shall not defame by libel or slander CO or their shareholders, partners, employees, agents, or contractors to any third party under any circumstances.  Performers who do so shall be liable for monetary damages caused by such defamation.
29. Performer shall not exchange personal contact information with any CO member and shall not meet or socialize with any CO member outside the clubs without the written permission of CO.
30. Performer shall maintain the confidentiality of all activities and members at CO.
31. CO may modify this agreement with written notice to Performer.
32. CO may suspend Performer for violating any of these rules or regulations.
33. CO and/or Performer may terminate this agreement at any time with written notice.

Performers are bound by CO's arbitration clause as follows:  Any dispute between Performer and CO must be presented to opposing party in writing followed by a 30-day period during which the parties must enter good faith negotiations to resolve the dispute. If the parties are unable to do so, any and all disputes may only be resolved by way of binding arbitration with the American Arbitration Association's regional office in Denver, Colorado pursuant to the laws of the State of Nebraska.  Performer may not sue in an individual, group or class action, CO, it's shareholders, partners, employees, agents, contractors, or any individual or entity related thereto under any circumstances.

Agreed and accepted this _____ day of _____, by and between:


_Andrea Grove_
Performer's Real Name Printed

_Andrea Gru_
Performer's Signature


_Harmony_
Dancer Name


_(402) 504-2972_
Performer's Phone Number

_Adeloris27@Gmail_
Performer's Email


_Shane Harrington_
CO Representative's Name Printed

_____
CO Representative's Signature

3



# EXHIBIT

## "B"

# Exhibit 1



4:19 2:20

**Club Omaha**

Shane

Ladies it seems Andrea Grove aka Harmony our ex dancer is trying to sue me and Club Omaha!  She is out recruiting current and ex dancers to jump on board.  I have already had to remove 2 dancers in our chat because they were apart of it.  Anyone who currently has a contract here and is a part of this or decides to be I will have to end your contracts immediately for obvious legal reasons.  I will also counter sue all parties involved for damages and legal fees.  Please make sure you understand what your getting involved in.  Just because a lawyer says they can help you doesnt mean they can.  Those involved are mostly ex dancers who are upset that they can't come back and work for Club Omaha so they want to destroy us.  They are working twice as hard at other clubs for half as much money and they are upset but then they should have followed their contracts and they would still be

Aa

# Exhibit 1

Shane

Ladies this 20-30 mins in the bathrooms is done.  Also no need to go to the bathroom with other girls.  This is work not a night out with the girls.

Mgr. Brad

20 or 30 minutes in the bathroom 20 or 30 minutes in the dressing room do not expect to go smoke after being in either spot that long

Shane Adam Harrington

I watch the cameras and there are a select group of you who are notorious for going in the back for 20-30 mins then going to smoke for 20 mins and then going back to the dressing room for another 20 mins before hitting the floor each time.  When you do that you waste an hour or more that you could be making money.  We have been hitting cap lately and I would rather have girls who want to make money here not ones who want to abuse the policies...

Kat

Shane Adam Harrington

I made some small changes

LADIES PLEASE READ!!!

I am upset this last weekend I literally watched in person @Brad Contreras make some of you an extra $100-$300 a night by upselling your dances. This is not his job he does this so you make the most money possible. Then MOST of the girls who he helped make this money DIDN'T even tip him out. This in my book makes you a HORRIBLE GREEDY person! I do not want people like this working at my club any longer. I will be keeping track with Brad who he is helping make more money and if those girls are not tipping out they will have their contract ENDED! We are looking for team players not greedy individuals at Club Omaha.

On average $5-$40 for your manager on the weekends depending on what you make and if he helped you make extra money. DJ should get $5-$20 depending on what you made and if he helped you make extra money on the stage DJ is paid well by us with your house fees so he makes good money already. Security should get $5-$20 total to split amongst themselves so this means you pay 1 security guard and the splits it up between them not each one.

If you have a great night like over $1,000 then tipping 10% or $100 total is actually the normal in this business. So many people had to work hard for you to have $1,000 plus nights so it's the right thing to do! If you have an absolutely horrible night $5 to each person for a total of $15 is acceptable.

○ Shane Adam Harrington removed Gabby Henriquez from the group.

4/28/19, 6:03 AM

Shane Adam Harrington

@Lizzy Wise, @Kia and @Mazye  you 3 better have a SUPER GREAT reason for not tipping out your manager tonight because your jobs depend on it...

4/28/19, 11:09 AM

Sexy B set the nickname for Brenna Reuschel to Angel.

# EXHIBIT

## "C"

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Nebraska

| | |
|---|---|
| ANDREA GROVE, individually and on behalf of all others similarly situated <br><br> _Plaintiff(s)_ <br><br> v. <br><br> MELTECH, INC., H&S CLUB OMAHA, INC. and SHANE HARRINGTON <br><br> _Defendant(s)_ | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No.  8:20-cv-00193 |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  SHANE HARRINGTON
5510 N 83rd St
Omaha, NE 68134

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Harold L. Lichten
Lichten & Liss-Riordan, P.C.
729 Boylston St., Suite 2000
Boston, MA 02116
617-994-5800
hlichten@llrlaw.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



CLERK OF COURT

Date:  **5/27/2020**                          _____
                                                                   _Signature of Clerk or Deputy Clerk_

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| ANDREA GROVE, individually and on behalf of similarly situated individuals, | ) ) ) | CLASS AND COLLECTIVE ACTION COMPLAINT |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| MELTECH, INC., H&S CLUB OMAHA, INC., and SHANE HARRINGTON, | ) ) ) ) | |
| Defendants. | ) ) | |

1.      Plaintiff Andrea Grove ("Plaintiff" or "Grove") brings this class and collective action behalf of herself and all other exotic dancers who have worked at H&S Club Omaha, Inc. ("Club Omaha") which is, upon information and belief, owned by Defendant Shane Harrington and managed by Defendant Meltech, Inc. Plaintiff brings this case under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA") and the Nebraska Wage and Hour Act, Neb. Rev. Stat. §48-1201 *et seq.,* on behalf of herself and others similarly situated. Plaintiff alleges that Defendants have misclassified exotic dancers working at Club Omaha as independent contractors rather than employees, have failed to pay them minimum wage and overtime compensation for hours worked in excess of 40 a week, and have required dancers to pay fees and tip-outs, which constitute unlawful kick-backs under the FLSA.

## **PARTIES**

2.      Plaintiff Andrea Grove ("Plaintiff") is a resident of Omaha, Nebraska. Plaintiff has worked as an exotic dancer at Club Omaha from approximately May 2016 until August 2019.

3.      Defendant H&S Club Omaha, Inc ("Club Omaha") is an establishment where live nude dance entertainment is presented to adult members of the general public. Club Omaha is

located at 2607 S 120th Street, Omaha, Nebraska. Upon information and belief, Club Omaha is owned and managed by Defendant Meltech, Inc., located in Omaha, Nebraska.

4. Defendant Shane Harrington is the owner of Defendant Meltech, Inc. and is an owner-operator of Defendant Club Omaha. He directs the operations of Club Omaha's business, countersigns the independent contractor agreements signed by Plaintiff and other exotic dancers, and is directly involved in Club Omaha's payroll and employee classification decisions.

## JURISDICTION AND VENUE

5. The Court has subject matter jurisdiction under 29 U.S.C. § 201 et seq. (Fair Labor Standards Act) and 28 USC § 1331 (federal question).

6. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant 28 U.S.C. § 1367(a), because these claims are so related to the federal claims that they form part of the same case and controversy.

7. Venue is proper in the District of Nebraska because the Defendants are located in Omaha, Nebraska, in this judicial district, and because the events giving rise to the Complaint took place in Omaha, Nebraska, in this judicial district.

8. The Court has personal jurisdiction over Defendant Shane Harrington since Defendant Harrington resides in Omaha, Nebraska, in this judicial district, and since his work as owner of Meltech, Inc. and Club Omaha has taken place in Omaha, Nebraska, in this judicial district.

7. Defendants employ individuals engaged in commerce or in the production of goods for commerce and/or handling, selling, or otherwise working on goods or materials that have been moved in or produced in commerce by any person, as required by 29 U.S.C. §§ 206-207.

8. Defendants' annual gross volume of sales made or business done exceeds $500,000.

2

## CLASS DEFINITIONS

9.      Plaintiff brings this action individually and as an opt-in, collective action pursuant to 29 U.S.C. § 216(b), on behalf of a class of all individuals who worked as exotic dancers at Club Omaha at any time within the three years prior to joining this lawsuit, who were misclassified as independent contractors and who were not paid minimum wage or overtime compensation as required by the Fair Labor Standards Act, and were subject to unlawful kick-backs under the FLSA.

10.      Plaintiff also brings this action individually and as a class action on behalf of a class of individuals who worked as exotic dancers at Club Omaha at any time within the three years prior to the filing of this lawsuit, who were misclassified as independent contractors and who were not paid minimum wage or overtime compensation as required by the Nebraska Wage and Hour Act, Neb. Rev. Stat. §48-1201 *et seq.*

## FACTUAL ALLEGATIONS

10.      Plaintiff and other exotic dancers who worked at Club Omaha performed dances on stage, private dances, and VIP room dances for Defendants' customers.

11.      There were between 25-30 exotic dancers working at Club Omaha on any given night.

12.      Plaintiff and other exotic dancers were required to schedule their shifts in advance, and were required to work a minimum of two shifts a week at Club Omaha Sunday through Thursday. If a dancer worked only one weekday, she was required to pay a $100 fee to Club Omaha. In practice, Plaintiff worked 4-5 shifts a week, with each shift lasting 10-12 hours.

13.      Plaintiff and other exotic dancers were required to pay $20-$50 in house fees each night; they were required to pay an additional $10 for every half hour they were late for their scheduled shift.

3

14.     Plaintiff and other exotic dancers were required to arrive at the club dressed and ready to perform

15.     Plaintiff and other exotic dancers were required to participate in a Facebook group run by Club Omaha and to read all messages in the group each day.

16.     Plaintiff and other exotic dancers did not receive any wages from Club Omaha. Instead, all their compensation came in the form of tips paid by customers for dances. Club Omaha set the prices customers were required to pay for dances, and determined the portion of the pay which Plaintiff and other dancers could keep. For example, a single song dance was $30, with the dancer receiving $20. A 30-minute bed dance was $200, with the dancer receiving $140.

17. If a dancer had less than 2 private dances during a shift, the dancer had to pay a $20 fee to Club Omaha.

18.     Plaintiff and other exotic dancers were required to go up on stage at regular intervals during their shift. If a dancer did not go up on stage during a given shift, she had to pay a $100 fee to Club Omaha.

19.     Dancers were required to work 8-hour shifts, and were required to pay a $50 penalty for leaving a shift early.

20.     Club Omaha required Plaintiff and other dancers to adhere to rules regarding their appearance – for example, dancers were required to have a natural hair color. The dancers were also not allowed to accept drinks form customers, or to drink alcohol during their shift without a manager's permission.

21.     Plaintiff and other exotic dancers were required to "tip out" each night, paying a minimum of $5 each to the DJ, security, and the manager.

22.     Defendants required Plaintiff and other exotic dancers to park in a specified area, and to enter the club through a specific entrance depending on the time of day.

23.     Plaintiff and other exotic dancers were subject to discipline, including termination, suspension, and fines if they failed to follow the rules and regulations set forth by Club Omaha, its owners, operators and managers. Plaintiff was terminated from club Omaha

4

after standing up for another dancer who refused to tip out Club Omaha's staff. This dancer was also terminated.

24.     The work performed by Plaintiff and other exotic dancers – namely, adult, exotic entertainment – was central to Club Omaha's business as a nightclub providing adult live dancing entertainment.

## COLLECTIVE ACTION ALLEGATIONS UNDER THE FLSA

25.     Plaintiff brings Counts I-II of this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of the FLSA Collective defined above.

26.     Plaintiff desires to pursue her FLSA claims on behalf of all individuals who opt-in to this action pursuant to 29 U.S.C. § 216(b).

27.     Plaintiff and the FLSA Collective Members are "similarly situated" as that term is used in 29 U.S.C. § 216(b) because, *inter alia*, all such individuals have been subject to Defendants' common business and compensation practices as described herein, and, as a result of such practices, have not been paid the legally mandated minimum wage and overtime compensation for hours worked over forty (40) during the workweek, and were required to pay

5

unlawful kickbacks to Defendants. Resolution of this action requires inquiry into common facts, including, *inter alia*, Defendants' common misclassification, compensation and payroll practices.

28.     The FLSA requires non-exempt hourly employees to be paid minimum wage for all hours worked and to be paid overtime compensation at a rate of 1.5 times the regular hourly rate for all hours worked over 40 in a week.

29.     Defendants misclassified Plaintiff and FLSA Collective Members as independent contractors, failed to provide them minimum wage and overtime compensation as required by the FLSA, and required them to pay unlawful kickbacks in violation of the FLSA.

30.     The similarly situated employees are known to Defendants, are readily identifiable, and can easily be located through Defendants' business records.

31.     During the relevant time period, Defendants have employed dozens of FLSA Collective Members. These similarly situated employees may be readily notified of this action through U.S. Mail and/or other means, and allowed to opt in to this action pursuant to 29 U.S.C. § 216(b), for the purpose of collectively adjudicating their claims for minimum wage and overtime compensation, unlawful kickbacks, liquidated damages (or, alternatively, interest) and attorneys' fees and costs under the FLSA.

### NEBRASKA CLASS ACTION ALLEGATIONS

32.     Plaintiff brings Count III of this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the Nebraska Class defined above.

33.     The members of the Nebraska Class are so numerous that joinder of all members is impracticable. Upon information and belief, there are more than forty (40) members of the Nebraska Class.

34.     Plaintiff will fairly and adequately represent and protect the interests of the

6

Nebraska Class because there is no conflict between the claims of Plaintiff and those of the

Nebraska Class, and Plaintiff's claims are typical of the claims of the Nebraska Class. Plaintiff's

Counsel are competent and experienced in litigating class actions and other complex litigation

matters, including wage and hour cases like this one.

35.     There are questions of law and fact common to the proposed Nebraska Class,

which predominate over any questions affecting only individual Class Members, including,

without limitation, whether Defendants have violated and continue to violate Nebraska law

through their policy or practice of classifying exotic dancers as independent contractors and

failing to pay them minimum wages.

36.     Plaintiff's claims are typical of the claims of the Nebraska Class Members in the

following ways, without limitation: (a) Plaintiff is a member of the Nebraska Class; (b)

Plaintiff's claims arise out of the same policies, practices and course of conduct that form the

basis of the claims of the Nebraska Class; (c) Plaintiff's claims are based on the same legal and

remedial theories as those of the Nebraska Class and involve similar factual circumstances; (d)

there are no conflicts between the interests of Plaintiff and the Nebraska Class Members; and (e)

the injuries suffered by Plaintiff are similar to the injuries suffered by the Nebraska Class

Members.

37.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions

of law and fact common to the Nebraska Class predominate over any questions affecting only

individual Class Members.

38.     Class action treatment is superior to the alternatives for the fair and efficient

adjudication of the controversy alleged herein. Such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without the duplication of effort and expense that numerous individual actions would entail. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. The Nebraska Class Members are readily identifiable from Defendants' own records. Prosecution of separate actions by individual members of the Nebraska Class would create the risk of inconsistent or varying adjudications with respect to individual Nebraska Class Members that would establish incompatible standards of conduct for Defendants.

39. A class action is superior to other available methods for adjudication of this controversy because joinder of all members is impractical. Further, the amounts at stake for many of the Nebraska Class Members, while substantial, are not great enough to enable them to maintain separate suits against Defendants.

40. Without a class action, Defendants will retain the benefit of their wrongdoing, which will result in further damages to Plaintiff and the Nebraska Class. Plaintiff envisions no difficulty in the management of this action as a class action.

## CLAIM FOR RELIEF

### Count I:  Minimum Wage and Overtime under the FLSA

41. Plaintiff incorporates by reference the previous paragraphs of the Complaint.

42. Pursuant to 29 USC § 206, an employer must pay employees at least the minimum wage for all hours worked, and 29 USC § 207 provides that overtime wages must be paid by the employer when the employee works more than 40 hours per week.

43. The Defendants failed to pay Plaintiff and collective action members the minimum wage as required by 29 U.S.C. § 206.

44. The Defendants also failed to pay Plaintiff and collective action members

8

overtime wages for work in excess of forty hours in a week, in violation of 29 U.S.C. § 207.

45.    Defendants' misclassification of dancers as independent contractors when they were really employees was knowing, willful, and intentional.

### Count II: Unlawful Kickbacks under the FLSA

46.    Plaintiff incorporates by reference the previous paragraphs of the Complaint.

The house fees and mandatory tip-outs that Defendants required from Plaintiff and the members of the collective constitute unlawful "kick-backs" to an employer under the FLSA, 29 U.S.C. § 203(m).

47.    29 U.S.C. § 203(m)(2) provides that "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit."

48.    The unlawful kickbacks received or required by Defendants were obtained knowingly, willfully, intentionally, or in bad faith.

49.    Plaintiff and the members of the collective are entitled to an award of back pay for all unlawful kickbacks required by Defendants.

### Count III: Violation of the Nebraska Wage and Hour Act

50.    Plaintiff incorporates by reference the previous paragraphs of the Complaint.

51.    The Nebraska Wage and Hour Act, Neb. Rev. Stat. §48-1201 *et seq.*, requires employers to pay minimum wage compensation for employees for all hours worked.

52.    During all relevant times, Plaintiff and other exotic dancers were employees of Club Omaha within the meaning of Neb. Rev. Stat. §48-1202.

53.    During all relevant times, Defendants were employers within the meaning of Neb. Rev. Stat. §48-1202.

54.    Plaintiff and other exotic dancers are entitled to recover their unpaid minimum wage compensation as well as attorneys' fees and costs pursuant to Neb. Rev. Stat. §48-1203 and Neb. Rev. Stat. §48-1206.

9

**WHEREFORE**, Plaintiff requests that the Court enter the following relief:

a. An order permitting this litigation to proceed as a collective action pursuant to 29 U.S.C. § 216(b);

b. Prompt notice, pursuant to 29 U.S.C. § 216(b), of this litigation to all potential members of the FLSA Collective;

c. An order permitting this litigation to proceed as a class action pursuant to Fed. R. Civ. P. 23 on behalf of the Nebraska Class;

d. An order appointing Plaintiff's attorneys as Class Counsel;

e. An award of monetary damages to Plaintiff and Class and Collective Action Members in the form of back pay for unpaid minimum wages and overtime compensation, reimbursement of all unlawful withholdings from Plaintiff's and the Class and Collective Action Members' wages, together with liquidated damages;

f. Attorneys' fees and costs; and

g. Such further relief as the Court deems just and proper.

Respectfully submitted,

By: */s/ Harold Lichten*
Harold L. Lichten
Olena Savytska
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
hlichten@llrlaw.com
osavytska@llrlaw.com

*Attorneys for Plaintiff
and the Proposed Class and Collective*

Dated:      May 26, 2020

# EXHIBIT

# "D"

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| ANDREA GROVE, individually and on behalf of similarly situated individuals, | ) ) ) | NO. 8:20-CV-00193-JFB-MDN |
| Plaintiff, | ) ) ) |  |
| v. | ) ) |  |
| MELTECH, INC., H&S CLUB OMAHA, INC., and SHANE HARRINGTON, | ) ) ) ) |  |
| Defendants. | ) ) ) |  |

## DECLARATION OF ANDREA GROVE IN SUPPORT OF
## MOTION FOR CONDITIONAL CERTIFICATION

Andrea Grove, being duly sworn, hereby states as follows:

1.  My name is Andrea Grove. I am an adult resident of Omaha, Nebraska.

2.  I worked as an exotic dancer at Club Omaha from approximately October 2018 to December 2019.

3.  As an exotic dancer, I performed dances on stage, one-on-one dances, and private room dances for Club Omaha customers.

4.  Club Omaha required me and other dancers required to schedule our shifts in advance, and were required to work a minimum of two shifts a week at Club Omaha Sunday through Thursday. If I worked only one weekday, I was required to pay a $100 penalty for the first weekend night that I work that week.  If I didn't work at all from Sunday to Thursday, I was required to pay a $100 penalty for each weekend night that I worked that week. These penalties were in addition to my "house fee". There was also a "cap" on how many dancers there could be at the club in one night. On occasion, dancers, including myself, would rush to the club to run to the front of the club to "clock in", just to be told that the club had reached its nightly cap and we have to go home.

5. I was required to work at least 8 hours shift from 6 p.m. to 5 a.m. and had a $50 fee if I wanted to leave before 8 hours was reached.

6. I usually worked 4-5 shifts a week, and worked 10-12 hours during each shift. I would usually arrive by 7 pm and stay until 5 am.  Some weekend nights would keep us open past 5 am, making for very long shifts.

7. . I was required to pay $20 for "house fee" on weeknights and $50 for "house fee" on weekends, if I signed in by 6:30 pm.  There was a $10 fine every 30 minutes after 6:31 pm.

8. When I came to Club Omaha for my shift, I was required to have my outfit on and be ready to perform.

9. I was required to participate in a Facebook group with the other exotic dancers, and read all the messages in this group each day. This group was run by Club Omaha. Shane Harrington, the owner of Club Omaha, often sent messages in this group chat. Screenshots of messages from this group are attached hereto as Exhibit 1.

10. I did not receive any wages from Club Omaha. All my compensation was in the form of tips paid by customers for dances. Club Omaha set the prices customers were required to pay for dances, and determined the portion which I could keep.

11. A single song dance cost the customer $30, and I kept $20. A 30-minute bed dance was priced at $200, and I kept $140.

12. If I had less than 2 private dances during my shift, I had to pay a $20 fee to Club Omaha.

13. I was required to go up on stage at regular intervals during my shift. If I did not go up on stage at all during a given shift, I had to pay a $100 fee to Club Omaha.

14. I was also required to "tip out" each night, paying a minimum of $5 each to the DJ, security, and the manager.

15. On many occassions, if a dancer did not tip out, Shane would call them out in the Facebook group chat the next day.

16. Club Omaha had strict rules regarding the dancers' appearance. For example, I was

required to have a natural hair color. Dancers including myself were prohibited from wearing any sort of robe while on the floor of the club.

17. I also had to follow Club Omaha's rules for how to conduct ourselves at the club. For example, I was not allowed to accept drinks form customers, or to drink alcohol on the floor during our shift. I had to park in a specific area, and enter the club through a specific door.

18. If there were patrons sitting alone on the floor, Shane and club managers often would message the Facebook group and tell us to get on the dance floor and mingle with them. They would accuse me and other dancers of being lazy and threaten our jobs at the club.

19. There were between 25-30 exotic dancers working at Club Omaha with me on any given night. Based on my observations and conversations with these dancers, they were also classified as independent contractors, were required to follow the same rules, were required to make tip-outs and pay fees to Club Omaha each night, and were not paid any wages.

20. I often witnessed other dancers being reprimanded for not following the rules set by Club Omaha.

21. I was terminated from club Omaha after I stood up for another dancer who refused to tip out the club staff. This dancer was also terminated on the same day.

26

Signed under pains and penalties of perjury this __ day of May, 2020.

*Andrea Grove*
_____

Andrea Grove

3

# EXHIBIT

# "E"



**H & S CLUB AMAHA INC**
2607 S 120TH ST
OMAHA, NE 68144-2860

1831
27-5/1040 236

Date 12/4/19

Pay to the Order of  Andrea Grove  $ 400.00

Four hundred 00/00  Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
Nebraska
wellsfargo.com

For Cleaning

⑆104000058⑆ 3405567821⑈ 01831

---

**H & S CLUB OMAHA INC**
2607 S 120 ST
OMAHA, NE 68144

1797
27-5/1040 236

Date 11/15/19

Pay to the Order of  Andrea Grove  $ 400 00

Four hundred dollar  Dollars

WELLS FARGO  Wells Fargo Bank, N.A.
Nebraska
wellsfargo.com

For Cleaning Club 2 weeks

⑆104000058⑆ 3405567821⑈ 01797

# EXHIBIT

# "F"

## CONSENT TO JOIN COLLECTIVE ACTION
### Pursuant to Fair Labor Standards Act, 29 U.S.C. § 216(b)

1.      I understand that this lawsuit is brought under the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. I hereby consent, agree, and "opt in" to become a plaintiff herein and to be bound by any judgment by the court or any settlement of this action.

2.      I work/worked as an exotic dancer from on or about _____10/2018_____ to ____02/2020_____ at Club Omaha, owned by Shane Harrington, located at 2607 S 120th Street in Omaha, Nebraska.

3.      During my employment, I was not classified as an employee, and I was not paid minimum wage, nor any wage, for my work and was required to pay fees in order to work, as well as to share my tips with non-tipped employees.

4.      I hereby designate the law firm of Lichten & Liss-Riordan, P.C. to represent me for all purposes in this action.

5.      I also designate the named Plaintiff in this action, the collective action representative, as my agent to make decisions on my behalf concerning the litigation, including the method and manner of conducting this litigation, entering into settlement agreements, entering into an agreement with Plaintiff's Counsel concerning attorneys' fees and costs (with the understanding that Plaintiff's Counsel are being paid on a contingency fee basis, which means that if there is no recovery, there will be no attorneys' fees), and all other matters pertaining to this lawsuit.

Signature: _____ Date: ___05/14/2020_____

Name: ___Andrea Grove_____

Address: ____████████_____

Omaha, NE ████ _____

Telephone: ████████_____ E-Mail: ████████████_____

### COMPLETE AND RETURN TO:
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
Tel: (617) 994-5800
Fax: (617) 994-5801
www.llrlaw.com
claims@llrlaw.com

# EXHIBIT

# "G"

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | |
|---|---|
| ANDREA GROVE, individually and on behalf of similarly situated individuals, | )<br>)<br>)    NO. 8:20-CV-00193-JFB-MDN |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| MELTECH, INC.,<br>H&S CLUB OMAHA, INC.,<br> and SHANE HARRINGTON, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

## DECLARATION OF ANDREA GROVE IN SUPPORT OF EEMERGENCY MOTION

Andrea Grove, being duly sworn, hereby states as follows:

1. My name is Andrea Grove. I am an adult resident of Omaha, Nebraska, and the named Plaintiff in the above-captioned case.

2. I worked as an exotic dancer at Club Omaha from approximately October 2018 to December 2019.

3. I was terminated from club Omaha after I stood up for another dancer who refused to tip out the club staff. This dancer was also terminated on the same day.

4. Last week, I got phone calls and texts from several dancers who had opted into this case, including Cassandra Schueth. The dancers told me they had gotten messages from Shane Harrington or had spoken to him in person about this lawsuit.

5. The dancers told me they were worried about moving forward with the case, and afraid of Shane bringing counterclaims against them.

6. At least two dancers told me they were fired last week after Shane learned they were part of this case.

7. On June 14, 2020, I received a screenshot of a message sent by Shane Harrington to a

group chat with the current dancers at Club Omaha from one of the dancers. A copy of this screenshot is attached hereto as Exhibit 1.

14

Signed under pains and penalties of perjury this ___ day of June, 2020.

*Andrea Grove*
_____

Andrea Grove

# EXHIBIT

# "H"

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

|  |  |  |
|---|---|---|
| ANDREA GROVE, individually and on behalf of similarly situated individuals, | ) ) ) | NO. 8:20-CV-00193-JFB-MDN |
| Plaintiff, | ) ) ) |  |
| v. | ) ) |  |
| MELTECH, INC., H&S CLUB OMAHA, INC., and SHANE HARRINGTON, | ) ) ) ) |  |
| Defendants. | ) ) ) |  |

## DECLARATION OF OLENA SAVYTSKA IN SUPPORT OF EEMERGENCY MOTION

Olena Savytska, being duly sworn, hereby states as follows:

1.  My name is Olena Savytska. I am an attorney at Lichten & Liss-Riordan, and counsel of record for Plaintiff in this case.

2.  On May 26, 2020 and June 3, 2020, our firm filed opt-in forms on behalf of a total of 12 dancers, including Plaintiff Andrea Grove. See Dkts. 2, 12.

3.  On June 8, 2020, at the request of Evan Spencer, counsel for Defendants, I emailed Mr. Spencer a list of the opt-ins' names.

4.  On the afternoon of June 8, 2020, Andrea Grove contacted me, explaining that dancers who had opted into the case were receiving threats from Shane Harrington and were questioning their decision to opt into the case.

5.  On June 10, Mr. Spencer sent seven separate emails to me and Mr. Lichten regarding the opt-ins, accusing them of fabricating their wage claims, and threating to pursue counterclaims against them for "breaches of contract, defamation, fraud and other causes of action."

6.  On June 10, 2020, I spoke with opt-in Cassandra Schueth, who described a message

1

exchange with Mr. Harrington about her participation in the case. Ms. Schueth expressed concerns about retaliation and counterclaims from Mr. Harrington, and worries about the consequences of pursuing her claims.

7. On the morning of June 11, 2020, I sent an email to Mr. Spencer asking him and his client to stop improper contact, threats, and retaliation against the opt-ins.

8. In his response to this email, Mr. Spencer threatened counterclaims against the opt-ins.

9. On June 11, 2020, I spoke with opt-in Diana Blanco. Ms. Blanco informed me she was confronted by Mr. Harrington, in the presence of Mr. Spencer, at Club Omaha, that Mr. Harrington questioned her involvement in this case, and that she was terminated.

10. On June 11, 2020, I received an email from opt-in Theresa Paskey. Ms. Paskey asked to opt out of the lawsuit. Mr. Paskey's opt-in form was withdrawn on June 12, 2020.

Signed under pains and penalties of perjury this 14 day of June, 2020.

/s/Olena Savytska
Olena Savytska

# EXHIBIT

## "I"

casetext    CARA A.I.    nebraska midnite shakers wages dancer    JX

Results   <   >            Mays v. Midnite Dreams, Inc.   Copy Cite

····Read    Analyses 0    Briefs 0    Citing Cases 15

# Mays v. Midnite Dreams, Inc.

SUPREME COURT OF NEBRASKA   Jul 13, 2018

300 Neb. 485 (Neb. 2018)

300 Neb. 485 · 915 N.W.2d 71

No. S-17-674.

07-13-2018

Elizabeth MAYS, and all others similarly situated, appellee, v. MIDNITE DREAMS, INC., doing business as Shaker's, and Daniel Robinson, appellants.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., L.L.O., Lincoln, for appellants. Kathleen M. Neary, of Powers Law, for appellee.

Funke, J.

Robert B. Creager, of Anderson, Creager & Wittstruck, P.C., L.L.O., Lincoln, for appellants.

Kathleen M. Neary, of Powers Law, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and Daugherty, District Judge.

Funke, J.

This appeal concerns an order from the Lancaster County District Court which found that Elizabeth Mays, an exotic dancer with Midnite Dreams, Inc., doing business as Shaker's, was an employee entitled to compensation under the federal Fair Labor Standards Act[1]

489   (FLSA) and the Wage and Hour *489 Act[2] (WHA). The district court then awarded damages and attorney fees and costs under the FLSA and the Nebraska Wage Payment and Collection Act[3] (NWPCA). While the court's ruling that Mays was an employee under the WHA was not clearly erroneous, the court erred in granting Mays relief under the FLSA and the NWPCA. Therefore, we affirm in part, and in part reverse and remand with direction to award damages and attorney fees and costs, calculated consistently with the WHA.

[1]   29 U.S.C. § 201 et seq. (2012 & Supp. IV 2016).

[2]   Neb. Rev. Stat. § 48-1201 et seq. (Reissue 2010 & Cum. Supp. 2016).

[3]   Neb. Rev. Stat. § 48-1228 et seq. (Reissue 2010 & Cum. Supp. 2016).

I. BACKGROUND

casetext   CARA A.I.   nebraska midnite shakers wages dancer   JX

Results ‹ ›       Mays v. Midnite Dreams, Inc.   Copy Cite

····Read   Analyses 0   Briefs 0   Citing Cases 15

owner and sole corporate officer of Midnite Dreams.

From 2012 to 2014, Mays danced at Shaker's, under two 1-year "Independent Artist Lease Agreements" with Midnite Dreams. Under the agreements, Mays paid a flat nightly fee for the use of Shaker's stage and dressing room, with additional fees for each use of the "VIP" or private rooms. The agreements did not provide that Shaker's would compensate Mays for any service and did not contain any schedule or minimum work requirements. The appellants never provided any compensation to Mays.

490 While dancing at Shaker's, Mays was informed of over 50 additional "house rules," posted at the facility and orally communicated to the dancers, concerning the dancers' conduct and the use of Shaker's facility. Robinson provided inconsistent *490 testimony as to whether these rules were mandatory or merely "suggestions." However, Mays testified that the house rules were enforced by Robinson and his employees and that failure to follow the house rules would result in discipline through belligerent reprimands, impositions *80 of fines, and threats to terminate the agreements, which were terminable at will.

The "house rules" concerned the dancers' shift arrival times; hair, makeup, lotion, and dress requirements for the dancers; the number and order of sets the dancers performed during a shift; the method of payment the dancers could accept from customers; cleaning duties; the price the dancers could charge for private and "VIP" room dances; off-stage dancer conduct; and conduct during onstage performances, specifying clothing items the dancers were expected to remove during certain sets.

Mays prepared a spreadsheet of the dates and hours she performed at Shaker's from various documents and recollections. She also calculated her average compensation from customer tips, after lease fees, while working at Shaker's as $44 per hour.

Mays filed a complaint and an amended complaint against the appellants seeking unpaid wages, liquidated damages, and attorney fees and costs under the FLSA and Nebraska law. Though Mays' amended complaint alleged that the appellants violated the FLSA and Nebraska law, it contained no allegations concerning whether Mays had engaged in commerce or whether Midnite Dreams was an enterprise engaged in commerce.

The court determined Mays was an "employee" entitled to minimum wage compensation under the FLSA and Nebraska law, applying the "ABC test" under § 48-1229(1)(a) through (c) and the 10-factor test under § 48-1202(3). The court concluded that by instituting and enforcing the house rules, the appellants transformed Mays into an employee and themselves into employers. The court also ruled Mays was not estopped from claiming she 491 was an employee.*491 The court determined Mays was entitled to a full minimum wage rate because, unlike Nebraska Law, the FLSA required specific notice requirements to count a "tip credit" against minimum wage requirements. Further, it ruled the FLSA entitled Mays to overtime compensation and liquidated damages. The court ruled the appellants were jointly and severally liable for $7,586.78 in damages for unpaid wages, $27,945 in attorney fees, and $504.70 in costs. The appellants filed a motion for new trial, which was denied.

## II. ASSIGNMENTS OF ERROR

The appellants assign, restated and reordered, error to the court for (1) concluding that a written lease agreement between the parties created an employment relationship, (2) applying the FLSA and the WHA policy statements to change the parties' contractual relationship, (3) failing to find Mays was estopped from arguing she was an employee, (4) finding Mays was an employee of the appellants, (5) finding Mays was entitled to minimum wage compensation, (6) failing to conclude Mays was a tipped employee, and (7) awarding excessive and unreasonable attorney fees.

## III. STANDARD OF REVIEW

The construction of a contract and the meaning of a statute are questions of law which an appellate court reviews de novo.[5] The determination of whether a contract violates public 492 policy presents a question *81 of law.[6] An appellate *492 court independently reviews questions of law decided by a lower court.[7]

> [5] *Brozek v. Brozek,* 292 Neb. 681, 874 N.W.2d 17 (2016).

> [6] *Johnson v. Nelson,* 290 Neb. 703, 861 N.W.2d 705 (2015).

> [7] *Donut Holdings v. Risberg,* 294 Neb. 861, 885 N.W.2d 670 (2016).

Ordinarily, a party's status as an employee or an independent contractor is a question of fact. However, where the facts are not in dispute and where the inference is clear that there is, or is not, a master and servant relationship, the matter is a question of law.[8]

> [8] *Williams v. Allstate Indemnity Co.,* 266 Neb. 794, 669 N.W.2d 455 (2003).

In a bench trial of a law action, the trial court's factual findings have the effect of a jury verdict, and we will not disturb those findings unless they are clearly erroneous.[9] In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.[10]

> [9] *Aksamit Resource Mgmt. v. Nebraska Pub. Power Dist.,* 299 Neb. 114, 907 N.W.2d 301 (2018).

> [10] *Elting v. Elting,* 288 Neb. 404, 849 N.W.2d 444 (2014).

Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[11] An appellate court may, at its option, notice plain error.[12]

> [11] *Houser v. American Paving Asphalt,* 299 Neb. 1, 907 N.W.2d 16 (2018).

> [12] *In re Robert L. McDowell Revocable Trust,* 296 Neb. 565, 894 N.W.2d 810 (2017).



minimum wage compensation? (4) Was the amount of attorney fees awarded to Mays excessive and unreasonable?

## 1. MAYS WAS EMPLOYEE ENTITLED TO COMPENSATION

(a) Agreements Neither Waived Protections Afforded to Mays by WHA nor Estopped Mays From Asserting Rights Under WHA

The appellants contend that because of the agreements entered into by the parties, as a matter of law, Mays cannot be considered an employee. They argue that the parties' constitutional right to contract supersedes the policy statement in § 48-1201. This argument, however, relies on a presumption that the WHA permits an employee to forfeit the protections afforded to him or her by the WHA through contract. The appellants fail to cite any authority for their argument that the protections of the WHA may be waived, and we find no basis for such in the WHA.

Section 48-1201 provides:

82  *82

> It is declared to be the policy of this state (1) to establish a minimum wage for all workers at levels consistent with their health, efficiency and general well-being, and (2) to safeguard existing minimum wage compensation standards which are adequate to maintain the health, efficiency and general well-being of workers against the unfair competition of wage and hours standards which do not provide adequate standards of living.

The policy statement in § 48-1201 is precisely why parties may not contract away the protections afforded by the WHA. It is the function of the Legislature, through the
494  enactment of statutes, to declare what is the law and public policy *494 of this state.[13] And a contract which is contrary to public policy is void.[14] Accordingly, the agreements are void to the extent they defined the parties' employment relationship, under § 48-1202(3).

13  *Bamford v. Bamford, Inc.,* 279 Neb. 259, 777 N.W.2d 573 (2010).

14  *Id.*

To the extent the appellants challenge the constitutionality of the WHA, we do not reach this argument. Neb. Ct. R. App. P. § 2-109(E) (rev. 2014) requires that a party challenging a statute's constitutionality file and serve notice with the Supreme Court clerk at the time of filing the party's brief. Strict compliance with § 2-109(E) is required in order for an appellate court to consider a challenge to the constitutionality of a statute.[15] A review of the record shows the appellants did not file a notice of a constitutional question with the clerk.

15  *Cain v. Custer Cty. Bd. of Equal.,* 291 Neb. 730, 868 N.W.2d 334 (2015).

The appellants also contend that because Mays profited from the agreements, she is estopped from claiming relief as an employee. The doctrine of equitable estoppel is based upon the principle that one who has previously taken a position with reference to a

4/14


"As to party estopped, (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts; as to the other party, (4) lack of

495  *495

knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice."[17]

    [17] *Id.* at 637, 294 N.W.2d at 362.

However, Mays could not have made a false representation or concealment of material facts by entering into the agreements the appellants imposed upon her. In addition, the appellants could not have relied, in good faith, upon the conduct or statements of Mays, because the agreements *83 cannot define the relationship between the parties for the purposes of § 48-1202(3). As a result, Mays cannot be estopped from exercising the rights afforded to her under the WHA.

83

(b) Court's Determination Mays Was "Employee" Under § 48-1202(3) Was Not Clearly Erroneous

While the appellants assigned error to the district court's determination that Mays was an "employee," the court made the determination under the three separate acts consisting of the FLSA, the WHA, and the NWPCA. Because the appellants reference only the 10-factor employee test that the court applied to the WHA, we confine our analysis to that determination. On appeal, we will consider only arguments that were both specifically assigned and specifically argued in the appellate brief.[18]

    [18] *Lombardo v. Sedlacek,* 299 Neb. 400, 908 N.W.2d 630 (2018).

No single test exists for determining whether one performs services for another as an employee or as an independent contractor, and the following factors must be considered:

(1) the extent of control which, by the agreement, the employer may exercise over the details of the work; (2) whether the one employed is engaged in a distinct

496  *496

one employed is engaged; (7) the method of payment, whether by the time or by the job; (8) whether the work is part of the regular business of the employer; (9) whether the parties believe they are creating an agency relationship; and (10) whether the employer is or is not in business.[19]

[19] *Allstate Indemnity Co., supra* note 8, 266 Neb. at 801, 669 N.W.2d at 461-62.

The appellants argue 3 of the 10 factors support a finding that Mays would be an independent contractor. Those three factors, which include the method of payment, the parties' belief that they were not creating an agency relationship, and the extent of control they had over the details of the work, each favor a determination Mays was an independent contractor.

While the court did not specifically address the method of payment or the parties understanding of their relationship, both support an independent contractor finding. Nevertheless, these were merely two factors considered in conjunction with the other eight factors.

Ordinarily, a party's status as an employee or an independent contractor is a question of fact.[20] In this matter, there is a factual question regarding what the "house rules" were and whether they were mandatory or were merely suggestions. As a result, we review the court's determination that Mays was an employee as a question of fact. In reviewing the court's factual determinations, we do not reweigh the evidence but consider it in the light 497 most favorable to Mays.*497 The court's decision strongly relied on a finding that the "house rules" imposed on Mays controlled almost every aspect of her employment. The court correctly noted that the "right of control is the chief factor distinguishing an 84 employment *84 relationship of that of an independent contractor."[21]

[20] *Id.* ; *Kime v. Hobbs,* 252 Neb. 407, 562 N.W.2d 705 (1997).

[21] See *Kime, supra* note 20, 252 Neb. at 414, 562 N.W.2d at 711.

As the district court also noted, the appellants were in the business of operating a club which offered fully nude, live entertainment. Mays' work was a vital part of that regular business. In addition, the appellants instituted the "house rules," which significantly controlled the manner in which the dancers performed their work, including the dancers' movement on stage and inside the club, the type of dress worn by the dancers, the dancers' cleaning duties, their schedule of performing, their contact with customers, the rates they charged, the method of payment, their cell phone usage, the types of lotions they used, the music they danced to, and their attendance at mandatory meetings. Further, the appellants meted out penalties for violations of the "house rules," which included monetary fines, relegation to less desirable time slots, and verbal reprimands.

The appellants' argument that they did not control the means and methods of the dancers' performances is not supported by the record, does little to undercut the well-reasoned analysis of the court, and fails to address the existence of the "house rules." In addition, the

The appellants argue in their brief that the evidence clearly shows Midnite Dreams, and not
498    Robinson, was Mays' employer *498 and that the court improperly pierced the corporate veil
without legal basis to make Robinson personally liable. They provide no support for their
implication that an owner of a company may be liable under employment laws for wages
only if the corporate veil may be pierced, which the court explicitly rejected in its order on
the motion for rehearing. Further, the appellants failed to assign error to the court's
determination that Robinson was one of Mays' employers and, therefore, was jointly liable
for her wages.

As mentioned above, we will consider only arguments that were both specifically assigned
and specifically argued in the appellate brief. The trial court ruled Robinson was an
employer based on his direct role at Shaker's, not merely through his role as the owner of
Midnite Dreams. Therefore, we do not consider this argument.

2. MAYS FAILED TO PROVE FLSA APPLIED

The FLSA requires employers subject to its provisions to pay each employee engaged in
commerce or in the production of goods for commerce, or who is employed in an enterprise
which is engaged in commerce or in the production of goods for commerce, specified
wages for all hours worked, certain of which are to be compensated at overtime rates.[22] Any
employer who violates these requirements is liable to each employee in the amount of his or
her unpaid minimum and overtime wages, an additional equal amount as liquidated
85    damages and reasonable attorney fees and costs.[23] *85 The trial court found that under the
FLSA, the appellants were liable to Mays for minimum wage, without any tip credit;
overtime wage compensation; liquidated damages; and attorney fees and costs. The
appellants argue the court erred in certain determinations of its liability under the FLSA.
499    *499 Nevertheless,

[22]    *Banks v. Mercy Villa Care Center,* 225 Neb. 751, 407 N.W.2d 793 (1987). See 29 U.S.C. §§
206 and 207.

[23]    See 29 U.S.C. § 216(b).

[t]o recover for minimum-wage or overtime violations under the FLSA, a plaintiff-
employee must demonstrate that either (1) his employer is an "enterprise engaged in
commerce or in the production of goods for commerce" or (2) the plaintiff himself
has "engaged in commerce or in the production of goods for commerce" in his
capacity as an employee.[24]

[24]    *Helfand v. W.P.I.P., Inc.,* 165 F.Supp.3d 392, 396 (D. Md. 2016), citing 29 U.S.C. §§ 206(a)
and 207(a)(1). Accord *Martinez v. Petrenko,* 792 F.3d 173 (1st Cir. 2015).

The FLSA defines commerce as meaning "trade, commerce, transportation, transmission, or
communication among the several States or between any State and any place outside
thereof."[25] In short, commerce, as used in the FLSA, means interstate commerce.[26]

[25]    29 U.S.C. § 203(b).

[26]    See *Banks, supra* note 22.

casetext    CARA A.I.    nebraska midnite shakers wages dancer    JX    🔍    §

Results  ‹  ›                    Mays v. Midnite Dreams, Inc.    Copy Cite

📄 🖨 📁 🔔  ••••Read    Analyses 0    Briefs 0    Citing Cases 15

matter of law.[29]

27  *Martinez, supra* note 24, 792 F.3d at 179.

28  *Id.* at 175. See, also, e.g., *Sobrinio v. Medical Center Visitor's Lodge, Inc.,* 474 F.3d 828 (5th Cir. 2007), citing *Warren-Bradshaw Co. v. Hall,* 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83 (1942).

29  *Fisbeck v. Scherbarth, Inc.,* 229 Neb. 453, 469, 428 N.W.2d 141, 151 (1988), citing *Banks, supra* note 22.

Neither the parties nor the court addressed this element of Mays' FLSA claims. Therefore, before addressing the merits of the award of unpaid minimum and overtime wages, liquidated damages, and reasonable attorney fees and costs, we consider *500 whether Mays made a sufficient showing to entitle her the protections of the FLSA as a matter of law.

As a dancer, Mays was not engaged in the production of goods in commerce. Instead, we limit our consideration to whether Mays engaged in commerce or whether Midnite Dreams was an enterprise engaged in commerce. The facts capable of establishing coverage under both of these theories are different. "To establish individual coverage, the employee must present facts showing his own activities. To establish enterprise coverage, the employee instead must present facts showing the activities of other employees, and the employer's sales."[30]

30  *Martinez, supra* note 24, 792 F.3d at 175.

(a) Evidence Does Not Show Mays Was Engaged in Commerce

"The question whether an employee is engaged 'in commerce' within the meaning of the [FLSA] is determined by practical considerations, not by technical conceptions."[31] " 'The test is whether the *86 work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated, local activity.' "[32] "The [U.S.] Supreme Court has articulated that it is the intent of Congress to regulate only activities constituting interstate commerce, not activities merely affecting commerce."[33] "Work that is purely local *501 in nature does not meet the FLSA's requirements, but '[a]ny regular contact with commerce, no matter how small, will result in coverage.' "[34]

31  *Mitchell v. Vollmer & Co.,* 349 U.S. 427, 429, 75 S.Ct. 860, 99 L.Ed. 1196 (1955). See, also, e.g., *Wirtz v. Modern Trashmoval, Inc.,* 323 F.2d 451 (4th Cir. 1963).

32  *Mitchell v. H. B. Zachry Co.,* 362 U.S. 310, 324, 80 S.Ct. 739, 4 L.Ed. 2d 753 (1960). See, also, e.g., *Josendis v. Wall to Wall Residence Repairs, Inc.,* 662 F.3d 1292 (11th Cir. 2011) ; *Williams v. Henagan,* 595 F.3d 610 (5th Cir. 2010) ; *Wirtz, supra* note 31.

33  *Thorne v. All Restoration Services, Inc.,* 448 F.3d 1264, 1266 (11th Cir. 2006), citing *McLeod v. Threlkeld,* 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943).

34  *Henagan, supra* note 32, 595 F.3d at 621. See, also, 29 C.F.R. § 779,109 (2017).

The 11th Circuit Court of Appeals has espoused the following test to determine if an employee is engaged in commerce:

of interstate telephone, telegraph, mails, or travel.[35]

35  *Thorne, supra* note 33, 448 F.3d at 1266, citing 29 C.F.R. §§ 776.23(d)(2) and 776.24 (2005).
    See, also, 29 C.F.R. § 779,103 (2017).

Regarding the first type of interstate employees, courts have further expounded on the actions that qualify as engaging in commerce to include an employee that "either crosses state lines in connection with his employment, handles goods directly moving in the channels of interstate commerce, or directly contributes to the repair or extension of facilities of interstate commerce."[36]

36  *Wirtz, supra* note 31, 323 F.2d at 457, citing *Vollmer & Co., supra* note 31.

There is also substantial case law considering the limits of this type of interstate employment. The U.S. Supreme Court has stated that "handlers of goods for a wholesaler who moves them interstate on order or to meet the needs of specified customers are in commerce, while those employees who handle goods after acquisition by a merchant for general local disposition are not."[37] Based on this principle, courts have rejected claims that
502  an employee operating a vehicle and purchasing *502 gasoline, both of which were produced out-of-state, was in the stream of commerce.[38]

37  *McLeod, supra* note 33, 319 U.S. at 494, 63 S.Ct. 1248.

38  *Jian Long Li v. Li Qin Zhao*, 35 F.Supp.3d 300 (E.D.N.Y. 2014), citing *Josendis, supra* note
    32, and *Thorne, supra* note 33.

In *Sobrinio v. Medical Center Visitor's Lodge, Inc.*,[39] an employee of a motel, connected to a large local medical center, worked in roles as a janitor, security guard, and driver for guests. He drove guests on errands to local stores and the medical center, but never drove them to the airport or other transportation centers. While he served many out-of-state
87  guests, the court held he was not engaged in commerce under the FLSA, because his *87 duties were purely local in nature.[40] It distinguished his transportation duties from those of other employees that "engaged in commerce when 'their work was entwined with a *continuous* stream of [interstate] travel.' "[41]

39  *Sobrinio, supra* note 28.

40  *Id.*

41  *Id.* at 829-30 (emphasis in original).

Regarding the second type of interstate employees, there is less agreement among courts on what activities constitute engagement in commerce.

In *Jian Long Li v. Li Qin Zhao*,[42] the U.S. District Court for the Eastern District of New York rejected an argument that using a cell phone " 'connecting to phone towers across the United States' " amounted to engaging in commerce. In *Jian Long Li*, the plaintiff used a cell phone to contact customers in the course of making local deliveries for a New York City restaurant. The court ruled "the use of a cellular phone by [the plaintiff], but *not* for communication between states, is strictly an intrastate activity, notwithstanding the fact that



coverage]."[44]

> [42] *Jian Long Li, supra* note 38, 35 F.Supp.3d at 308.
>
> [43] *Id.* at 309, citing *Junkin v. Emerald Lawn Maint. & Landscaping, Inc.,* No. 04-CV-1537, 2005 WL 2862079 (M.D. Fla. Nov. 1, 2005). See, also, 29 C.F.R. § 779.103.
>
> [44] *Jian Long Li, supra* note 38, 35 F.Supp.3d at 309.

Two unpublished U.S. District Court opinions have addressed what activities of dancers constitute engaging in commerce, *Miller v. Centerfold Entertainment Club, Inc.* [45] and *Foster v. Gold & Silver Private Club, Inc.* [46] In *Miller*, the court rejected arguments that a dancer was engaged in commerce by dancing for out-of-state customers and serving beverages produced in another state, but ruled the dancer's use of music streamed over the Internet, text messages to clients, and self-publication on social media constituted engagement in commerce. In *Foster*, the court ruled broadcasting dances over the Internet was engagement in commerce.

> [45] *Miller v. Centerfold Entertainment Club, Inc.,* No. 6:14-CV-6074, 2017 WL 3425887 (W.D. Ark. Aug. 9, 2017) (unpublished decision).
>
> [46] *Foster v. Gold & Silver Private Club, Inc.,* No. 7:14CV00698, 2015 WL 8489998 (W.D. Va. Dec. 9, 2015) (unpublished decision).

At oral arguments, Mays argued that Robinson's contracting with dancers from outside Nebraska and scheduling them to come to Nebraska and the fact that Mays commuted to Nebraska to dance constituted engagement in interstate commerce. However, the record is devoid of evidence that Robinson communicated with the dancers across state lines by using cell phones or the Internet. In addition, as mentioned above, only Mays' personal activities are relevant to analyzing whether she was an employee engaged in commerce. The U.S. Department of Labor regulations explicitly distinguish an employee's personal
504 actions of commuting to and from the work place, which do not constitute engaging in *504 commerce, from an employee's traveling across state lines in the performance of his or her
88 duties, *88 who must do so consistently to be considered engaged in commerce.[47] Further, it has been held that an employer's action of hiring an employee in another state and paying for his travel to the state where his employment activities were located did not amount to that employee's engaging in commerce, because the relocation was unrelated to the employee's actual duties.[48] We decline to expand the scope of the FLSA to cover employees based on actions performed in their personal capacity with no relation to the performance of their employment.

> [47] 29 C.F.R. § 776.12 (2017). See, also, 1 Les A. Schneider & J. Larry Stine, Wage and Hour Law § 4:3 (2018).
>
> [48] *Oliphant v. Kaser et al., d.b.a. Kaser Construction Co.,* 10 Lab. Cas. (CCH) ¶ 62,928 (Dallas Cty. Dist. Ct., Iowa, No. 16470, Nov. 13, 1945).

Here, even considering the most liberal standards, the evidence fails to show that Mays engaged in interstate commerce. Even the activities the court in *Jian Long Li* was concerned would bring all employees in the modern era under FLSA coverage are not present.

49   See *Sobrinio, supra* note 28.

Unlike *Miller* , there was no evidence Mays ever communicated with customers in Nebraska or elsewhere by telephone or promoted herself on social media. Also, while the dancers could request music, Robinson and the disk jockey exclusively handled playing music and it was not established that such music was streamed via the Internet. Therefore,

505   we must *505 conclude that as a matter of law, Mays failed to make even a minimal showing she engaged in commerce.

(b) Evidence Does Not Show Midnite Dreams Was Enterprise Engaged in Commerce

The FLSA defines an " '[e]nterprise engaged in commerce or in the production of goods for commerce' " as, in relevant part, an enterprise that

> (A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

> (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).[50]

> 50   29 U.S.C. § 203(s)(1).

FLSA coverage through enterprise coverage is particularly expansive compared to individual coverage based on the broad definition of how an employee may engage in commerce in § 203(s)(1)(A)(i).[51] Congress, however, curbed this potentially limitless definition by including the revenue threshold in § 203(s)(1)(A)(i).[52] To succeed on a FLSA

89   claim alleging enterprise coverage, an employee must elicit "evidence to prove that *89 his employer's sales were high enough to trigger coverage under the [FLSA]."[53]

51   *Helfand, supra* note 24 ; *Ethelberth v. Choice Sec. Co.,* 91 F.Supp.3d 339 (E.D.N.Y. 2015).

52   *Helfand, supra* note 24.

53   *Martinez, supra* note 24, 792 F.3d at 175.

We need not consider the scope of activities constituting enterprise coverage here, because

506   there was no evidence *506 adduced or even an allegation concerning the annual gross volume of sales made or business done by Midnite Dreams. Therefore, we must conclude that as a matter of law, Mays failed to make even a minimal showing Midnite Dreams was an enterprise engaged in commerce.

The court's ruling in favor of Mays on her FLSA claims, despite Mays' failure to prove all of the elements of her claims, affected a substantial right of the appellants, and to leave this error uncorrected would amount to a miscarriage of justice. Therefore, we find plain error in the court's ruling that Mays was entitled to compensation, overtime compensation, no tip credit, liquidated damages, and attorney fees and costs under the FLSA.

3. MAYS WAS TIPPED EMPLOYEE

Results   ‹   ›

Mays v. Midnite Dreams, Inc.   Copy Cite

Read   Analyses 0   Briefs 0   Citing Cases 15

Mays' evidence that she was compensated by way of gratuities at an average rate of $44 per hour clearly satisfies this requirement. Therefore, under § 48-1203(2), Mays was entitled to a wage of only $2.13 per hour.

### 4. MAYS WAS NOT ENTITLED TO RELIEF UNDER NWPCA

The NWPCA requires that absent an exception, "each employer shall pay all wages due its employees on regular days designated by the employer or agreed upon by the employer and employee."[54] Under the NWPCA, "[a]n employee having a claim for wages which are not

507 paid within thirty days of the *507 regular payday designated or agreed upon may institute suit for such unpaid wages in the proper court."[55] We have summarized this cause of action as "essentially permit[ting] an employee to sue his or her employer if the employer fails to pay the employee's wages as they become due."[56]

54  § 48-1230(1).

55  § 48-1231(1).

56  *Pick v. Norfolk Anesthesia,* 276 Neb. 511, 516, 755 N.W.2d 382, 386 (2008).

"Wages" are defined as "compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis."[57] Accordingly, we have stated that " 'unpaid wages' means 'wages which are not paid within thirty days of the regular pay day designated or agreed upon.' "[58]

57  § 48-1229(6).

58  *Polly v. Ray D. Hilderman & Co.,* 225 Neb. 662, 670, 407 N.W.2d 751, 757 (1987).

Statutory language is to be given its plain and ordinary meaning, and an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain,

90  direct, and unambiguous.[59] *90 As expressed by the preceding provisions, the plain language of the NWPCA indicates that the act only applies to a situation where a regular payday has been established by an employer unilaterally or with the consent of an employee. An employee is not granted a cause of action in the case where no regular payday has been established and he or she has never received payment from his or her employer. Instead, an employee denied minimum wage compensation for employment that has no regular payday may only proceed to recover under the WHA.[60] Further, "wages,"

508  under the NWPCA, is *508 expressly limited to a situation where the parties have agreed the employer will compensate the employee for performing work under the terms of the agreement.

59  *Becher v. Becher,* 299 Neb. 206, 908 N.W.2d 12 (2018).

60  § 48-1206(5).

sufficient to bring the agreements within the scope of the NWPCA.

Therefore, Mays was not entitled to relief under § 48-1231 of the NWPCA.

While Mays is still entitled to recover minimum wage benefits under the WHA, the court's decision to grant relief under § 48-1231 affected a substantial right of the appellants by making them liable for attorney fees from this appeal and requiring them to defend against the possibility of liability for liquidated damages under § 48-1232. Thus, we find the court's ruling that Mays was entitled to minimum wage compensation and attorney fees and costs under § 48-1231 constitutes plain error.

## 5. ATTORNEY FEES

Because we determine the court erred in awarding attorney fees under the FLSA and the NWPCA, we do not consider the appellants' assignment of error regarding whether the amount of attorney fees the court awarded to Mays was excessive and unreasonable. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[61]  *509 V. CONCLUSION

509

61  *Amend v. Nebraska Pub. Serv. Comm.,* 298 Neb. 617, 905 N.W.2d 551 (2018).

--------

We conclude the trial court's determination that Mays was an employee entitled to a minimum wage under the WHA was not clearly erroneous, but Mays was entitled to only the minimum wage amount for tipped employees. The WHA may also entitle Mays to attorney fees and costs. Nevertheless, the court erred in ruling Mays was entitled to relief under the FLSA and the NWPCA. Therefore, we affirm in part, and in part reverse and remand with direction to award damages and attorney fees and costs, calculated consistently with the WHA.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTION .

Coverage

SmartCite

Public records

Partnerships and Resources

Law school

Bar associations

Help articles

Customer support

About us

Jobs

Blog

Podcast

News

Twitter

Facebook

LinkedIn

Instagram